JS - 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| D.L. EDMONSON SELECTIVE SERVICE INC. dba SELECTIVE LIMOUSINE SERVICE, A CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>LCW AUTOMOTIVE CORPORATION and MODERN TECHNOLOGIES GROUP, INC. and DOES 1-50,<br><br>Defendant. | Case No. CV07-3303 CAS (VBKx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

The case was tried to the Court on August 18, 19, and 20, 2009. Closing argument was heard on October 8, 2009. Robert F. Brennan, of Brennan, Wiener & Associates, APC, appeared as counsel on behalf of plaintiff. Michael T. Taurek, of Green & Hall, APC, appeared as counsel on behalf of defendant LCW.

**I.    INTRODUCTION**

On March 15, 2007, David L. Edmonson ("Edmonson"), filed a suit in Los Angeles County Superior Court against defendants LCW Automotive Corp. ("LCW") and Modern Technologies Group, Inc. ("MTG"). The action was timely removed to this

Court on May 18, 2007. On September 17, 2007, the Court granted defendants' motion to dismiss with leave to amend.

On December 13, 2007, D.L. Edmonson Selective Service Inc. d.b.a. A Selective Limousine Service ("plaintiff"), substituted in as the party plaintiff in place of Edmonson, and filed a first amended complaint ("FAC") against LCW, MTG, Distribution of Limousines, Inc. ("Distribution"), and Ford Motor Company ("Ford").[1] On March 10, 2008, the Court granted defendants LCW and MTG's motion to dismiss plaintiff's claims for (1) breach of implied warranty under the Song-Beverly Consumer Warranty Act, California Civil Code § 1790, *et seq.* ("the Song-Beverly Act"); (2) breach of express warranty under Cal. Comm. Code § 2313; and (3) breach of express warranty under the Magnuson-Moss Act.

On February 28, 2008, plaintiff filed a second amended complaint ("SAC") against defendants LCW, Distribution, Ford, MTG, and Does 1 through 50, alleging claims for: (1) violation of the Song-Beverly Act against LCW, Ford, and Does 1 through 50; and (2) breach of express warranties pursuant to California Commercial Code § 2313 against Ford, LCW and Does 1 through 50. The case proceeded to trial against LCW on plaintiff's claim for breach of the express warranty claim under the Song-Beverly Act, CaCivil Code § 1793.2.[2]

## II. FINDINGS OF FACT[3]

In 2005, plaintiff leased a new motor vehicle, a passenger car that had been converted into a limousine, through Advantage Funding Commercial Capital Corp.

---

[1] D.L. Edmonson Selective Service Inc. d.b.a. A Selective Limousine Service is an entity that is owned by Edmonson.

[2] On March 10, 2008, plaintiff dismissed MTG from the instant action. Then, on November 7, 2008, plaintiff reached a settlement with defendant Ford. The Court dismissed Distribution, for lack of prosecution, on March 26, 2009.

[3] To the extent necessary, each of these findings of fact may be deemed to be a conclusion of law.

("Advantage"). Ford manufactured the vehicle and LCW and Distribution converted it into a limousine. Plaintiff alleges that the vehicle was defectively manufactured, designed, and/or assembled, and that defendants have breached express and implied warranties by failing to repair the vehicle.

LCW is a Texas Corporation that performs custom automotive and limousine conversions. In 2005, LCW converted a new 2006 Lincoln four-door sedan into a 120 inch limousine ("the limousine") at a LCW facility in Nuevo Laredo, Mexico, and customized the vehicle to plaintiff's specifications. Plaintiff intended to use the limousine as a commercial vehicle in its ground transportation business operating out of Lancaster, California.[4] After the conversion, the limousine was shipped to LCW's headquarters in San Antonio, Texas, where Edmonson, on behalf of plaintiff, took physical possession of the limousine on December 22, 2005. Before taking physical possession of the limousine at LCW's headquarters, Edmonson performed an inspection of the vehicle over at least a two day period. Edmonson testified that between December 20 and 22, 2005, he "spent several hours looking at," "going through," and "inspecting the vehicle at the LCW plant in San Antonio, Texas." 8/18/09 Trans. 133:14-25;134:16-25. He then signed a written "delivery receipt" confirming the limousine was "received in proper order." Ex. 152. The limousine came with a warranty from LCW.[5] Ex. 40.

---

[4] The limousine weighs less than 10,000 pounds and plaintiff has fewer than five vehicles registered to it in the State of California.

[5] The express warranty provided in pertinent part that:
LCW warrants that each LCW body and the parts manufactured by it, contained therein, and sold as a new vehicle . . . will be free from defects in material and workmanship under normal use and service for 24 months or until the vehicle has been driven 24,000 miles, whichever occurs first, after the date of delivery to the original retail customer. This warranty (together with the remedies for breach thereof) is limited, however, to the following: if the body or any such part manufactured by LCW becomes defective during this

(continued...)

3

Rather than purchasing the limousine, plaintiff opted to lease it through Advantage.[6] Plaintiff was required to execute multiple lease agreements with Advantage because of mistakes found in the lease forms, including an incorrect Vehicle Identification Number listed on one of the leases.[7] Edmonson testified that before he left LCW, he made a twenty percent down payment on the limousine, as required by the lessor Advantage.  8/18/09 Trans. 135:14-19.  He then drove the limousine back to Los Angeles County, California, before receiving, and ultimately signing, the final corrected lease agreement, dated December 23, 2005 (the "Lease"), in January 2006.[8]  See Ex. 3; Ex. 153.  Edmonson testified that the purpose of picking up the limousine in Texas was to drive the limousine the roughly 1,600 miles and "identify in that road trip" if the

---

[5](...continued)
period, under normal use and service, and the vehicle is brought to the repair facility of any authorized LCW dealer . . ., the dealer will without charge, either repair the defective part or replace it with a new or factory reconditioned part after obtaining authorization from LCW.
Ex. 40.

[6] APC Sales Corp., a New York corporation, sold the limousine to Advantage on December 19, 2005.  Ex. 138.  The Bill of Sale indicates that the "shipping terms" for the limousine were "pickup."  Id.

[7] Edmonson testified that he received and signed two lease forms from Advantage, in California, prior to going to Texas in December 2006.  8/18/09 Trans. 53:1-11, 135:1-14.

[8] The Lease provides that the limousine "will be principally operated and garaged in the State of CA."  Ex. 3, ¶ 3.  The lease also provides that it "SHALL BE INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE IN WICH [sic] THE LESSOR'S PLACE OF BUSINESS DESIGNATED [sic] HEREIN; AND REGARDLESS OF THE ORDER IN WHICH THE SIGNATURES OF THE PARTIES ARE AFFIXED, IT SHALL BE DEEMED EXECUTED AT THE LESSOR'S PLACE OF BUSINESS DESIGNATED HEREIN."  Id. ¶ 13.  The Lessor's address is identified as "Long Island City, New York."  The limousine is registered in California and the lease payments include payment of California taxes.  See 8/18/09 Trans. 69:11-25.

4

vehicle was operating properly. 8/18/09 Trans. 55:7-18. During the trip from Texas to California, he did not discover any material non-conformities. However, he did prepare a list of mainly "cosmetic items" that needed correcting and submitted the list to LCW's chief financial officer and founder, Ken Boyar ("Boyar"), on January 3, 2006. Ex. 5. On LCW's recommendation, plaintiff took the limousine to Kitt Dickman ("Dickman") of LA Limo Repair, an authorized LCW repair facility in California, in January 2006. According to Edmonson, when he went to pick up the limousine about two weeks later, he observed that the entire interior of the passenger compartment of the vehicle was torn apart. 8/18/09 Trans. 62:2-22. Dickman advised Edmonson that LA Limo Repair would not be able to repair the limousine because some of his technicians had quit, and suggested that Edmonson take the vehicle back to LCW in Texas for further repairs. See Ex. 7; 8/18/09 Trans. 62:23-12.

On January 30, 2006, Edmonson contacted Boyar and arranged to bring the limousine back to Texas for further repairs. Ex. 10. He drove the limousine back to LCW in Texas, where it remained for some time between three days and a week. 8/18/09 Trans. 65:11-18. Edmonson testified that on driving the limousine back to Los Angeles, he noticed, for the first time, a "clicking" sound from the "LimoTouch" control board, manufactured by MTG. Id. 66:7-67:21. At the recommendation of Jim Kribbs ("Kribbs") of LCW, Edmonson took the limousine to Professional Auto Tech, an authorized LCW repair facility in California, on March 23, 2006. Id. 67:24-68:10; Ex. 12 (repair invoice). LCW paid Ricardo de la Espriella ("de la Espriella"), of Professional Auto Tech, to try and rectify the complaint with the LimoTouch control board. De la Espriella worked with MTG to get a board programmed from MTG that would not produce a "clicking" sound, and in the process had to replace or repair the control board on numerous occasions.[9]  See Exs. 20, 23; 8/19/09 Trans. 12:3-8. At trial,

---

[9] The first repair attempt on the LimoTouch control board, to fix the "clicking" sound, occurred on May 26, 2006, when the limousine had a mileage
(continued...)

5

Edmonson conceded that the LimoTouch system no longer makes the "clicking" sound and that this problem was ultimately repaired. 8/20/09 Trans. 18:22-25.

On September 18, 2006, Edmonson contacted Kribbs with a list of several problems and notified LCW that he would be taking the limousine back to Professional Auto Tech that week. Ex. 25. In the letter, Edmonson complained, for the first time to LCW, about dissatisfaction with the performance of the heating system in the passenger compartment of the limousine.[10] Edmonson took the limousine back to Professional Auto Tech, on September 22, 2006, to have the heating system inspected and to address other concerns.[11] Ex. 26. De la Espriella confirmed that there was a heating problem in the limousine and sent a fax to Kribbs, on October 12, 2006. Ex. 27. He noted, among other things, that

> MTG keeps having problems programming the control unit the problem is that when heat is put on the left fan does not turn off, and ac still comes through on the right fan the heater valve does turn on and allows hot water through but ac still flowing in to evaporator causing luke warm air go through the vents.

Id. The parties dispute as to whether the alleged problem with the heating system occurred as a result of repairs to the control board, or at least worsened because of these modifications, or if the problem reflects a defect in the design of the limousine. Specifically, Edmonson testified that when he picked up the limousine

---

[9](...continued)
of 11,584 miles. Ex. 32. Edmonson sent several email communications to LCW during this period regarding the issue of repairing the control board. See, e.g., Exs. 14, 16-19. de la Espriella testified that he replaced the system "probably six, seven times." 8/19/09 Trans. 12:3-8.

[10] He stated that there was "no heat, when higher temperature is selected for heat Fan Fuse blows." Ex. 25.

[11] At that time, the odometer reflected that the limousine had been driven approximately 23,963 miles.

6

in December 2005, he was able to digitally select a temperature and that the control board would automatically turn on or off the air conditioning and heat air combination unit, respectively, until the desired temperature within the passenger compartment was reached. 8/18/09 Trans. 40:15-41:24. However, according to Edmonson, a problem developed with the heating system such that the passenger compartment effectively did not reach a sufficiently warm temperature because "ambient air" flows into the passenger compartment and "overpowers the heat." See, e.g., id. 42:3-9. On the other hand, LCW's witness, de la Espriella testified that the limousine was not designed to heat if the air conditioning compressor for the driver compartment was engaged, inasmuch as it results in Freon flowing to the rear evaporator of the passenger compartment, causing the dual core system in the passenger compartment to blow cool air. According to de la Espriella, this is not an uncommon design in the industry. See 8/19/09 Trans. 12:23-13:14, 35:25-36:24, 61:4-17.

      Edmonson contacted Boyar on October 16, 2006, and notified him that there were still problems, among others, with the control board and that the "A/C will not shut off when heat is need [sic]." Ex. 29. In this email communication, he also states that "we have had this A/C & Heat issue from the pick up date in Dec[ember]." Id. Then, on October 23, 2006, Edmonson contacted Kribbs and explained that he had been "turning down early am pick ups as well as referring some of [his] customers to another Limo company" because of the malfunctioning heating system. Ex. 31. Edmonson contacted de la Espriella on October 26, 2006, and again complained about the heating system. Ex. 33. On November 1, 2006, he emailed to Kribbs and Boyar about the heating system. Ex. 34. He contacted them again on November 12, 2006, indicating that the situation was "critical" because he just found a passenger sitting on the floor of the limousine for warmth. Ex. 35. Edmonson testified that LCW did not respond to these letters. 8/18/09 Trans. 102:13-14. However, Kribbs did respond to Edmonson on October 23,

1   2006, and wrote that "Chino at [the LCW] plant spoke with Ricardo [de la
2   Espriella] this AM, and we are trying to come up with a modification of the Limo
3   Touch system for complete control of the rear heater." Ex. 31.
4         On December 4, 2006, Edmonson took the limousine back to Professional
5   Auto Tech, where its technician installed a new MTG control board because the
6   board previously installed by de la Espriella to remedy the clicking sound was
7   causing the fan on the driver's side evaporator to remain on during heating. Ex.
8   36; 8/19/09 Trans. 18:6-16, 37:2-9. However, the new board made another
9   "clicking" sound, so after conferring with Edmonson, de la Espriella reinstalled
10  the old control board that did not click. 8/19/09 Trans. 43:3-25. During that same
11  visit, de la Espriella also installed, at LCW's expense, a modification to the design
12  of the limousine, at LCW's expense, which was intended to prevent freon from
13  circulating to the passenger heating and cooling system.[12] De la Espriella then
14  tested the system, and according to his testimony, the system was now working
15  satisfactorily. 8/19/09 Trans. 50:9-13. He found that it was now blowing very
16  hot hair into the passenger compartment and the fan did not impede the heating of
17  the cab. Id. 63:3-65:25.   He told Edmonson that it was his opinion that the
18  system was working well, but that if Edmonson did not like it, then he could make
19  it so the fan cut out on the left side during periods of heating. 8/19/09 Trans. 19:1-
20  20:4. Edmonson left with the limousine. He testified that it was his
21  understanding that this modification was a temporary fix until they obtained the
22  right control board, and that LCW and de la Espriella were going to do something
23  additional to fix the condition. 8/18/09 Trans. 155:15-21. However, according to

---

[12] The modification involved the installation of a solenoid or valve that would electronically open and close depending on whether the passengers in the rear compartment request hot or cold air. Accordingly, if the passengers requested hot air, then the valve was designed to close and prevent freon from getting into the compartment air system.

1  Edmonson, despite this latest modification, the heating system was still defective
2  and inadequate on cold mornings or evenings. 8/18/09 Trans. 104:11-23.
3  Edmonson testified that at this point, he stopped bringing the limousine back to de
4  la Espriella because he thought the "only way to get this car fixed correctly was
5  for somebody from LCW start from ground 1, pull the seats out, troubleshoot the
6  wiring, find out what's going with the control unit and fix the dog-gone car."[13]
7  8/18/09 Trans. 172:3-173:9.

    Edmonson notified Boyar and Kribbs on December 6 and 20, 2009, about
the continuing problems with the heating system.[14] Exs. 37, 38. Boyar testified

---

[13] After December 2006, Edmonson brought the limousine in to de la Espriella on four occasions, for service, but did not mention to him that he was dissatisfied with the performance of the heating system. 8/18/09 Trans. 109:18-110:18, 111:13-17; see Exs. 54-57.

[14] In the first letter, Edmonson reported that the system "worked in a way but [is] still not accurate," and inquired about "a trade in." Ex. 37. In the second, longer letter, he told Boyar, among other things, that

> I have had this [control board] problem from within 30 days of purchase. I have taken this coach and put over 3500 miles on her to get items corrected by driving her back to Texas to have the builder correct and fix issues with the coach. [T]hey paid for my stay and tried to fix everything on my list. However the A/C and controlled/MTG computer still had issues I have lost week up weeks of down time. Paid out of pocket for hotel stays, driven 2hrs one-way every time for repairs all with out compensation. I am now with out exaggeration on my 6th computer and the A/C system still is not correct. As well as this is still a problem with the control unit. I[t] takes 1/2 an hour for the heat to get to the back vents on the right side of the coach and warm at best. Yet the partition vent do blow hot. while this is going on the left side vents are blowing air (not a/c) I have to put the fan speed on F1 manually or the heat will never compensate for the air flow out of the left side. This cost money as well . . . . If this were a[n] ordinary car, and you were not family it would have been replaced by now. That's my dilemma I don't want

(continued...)

that LCW received a letter from plaintiff's counsel on December 19, 2006.[15] 8/20/09 Trans. 93:2-5. On December 20, 2006, Edmonson also sent an email to Kribbs inquiring about other miscellaneous items for the limousine, including a "foot rest and in lays (carpets)." Ex. 75  Kribbs wrote back on January 31, 2007, regarding these items. Id. Edmonson responded that same day and asked Kribbs "is anyone aware we still have a heat and A/C problem?" Id.  He also mentioned that he received "a phone call from the Lemon Law attorney" and was going to take the limousine to the attorney's mechanic. Id. On February 23, 2007, Kribbs wrote to Edmonson and inquired whether "anything had been accomplished" with the MTG/LimoTouch people. Ex. 132. Edmonson wrote back that day and stated that the "controller is really goofy now" and that he had not heard back from MTG, LCW, or his attorney. Id. In an email dated March 2, 2007, Edmonson proposed to Kribbs that he trade in the limousine and inquired if this could be done. Ex. 133. Kribbs responded by email on March 6, 2007, and said that he forwarded the message to Boyar, who would be available to discuss the matter the next day and asked Edmonson to call him. Id. On April 12-13, 2007, Boyar and Edmonson exchanged emails regarding taking orders on a "Nav 140's." Exs. 134, 135.

On April 17, 2007, Edmonson informed Boyar that he had contacted his attorney and "let him know . . . that [LCW was] going to take care of whatever need[ed] to be done to correct the problems" and that his attorney's staff would be

---

[14](...continued)
 to replace her. I don't want to burn any bridges. . . . I would ask to
 trade this in on an 07 and start over but I still feel it's a repair issue
 not a build issue.
Ex. 38.

[15] The record is unclear as to the substance of this letter, and neither party offered into evidence a copy of the letter.

contacting him. Ex. 108. That same day, Boyar wrote back and asked Edmonson for a contact person. Id. However, Edmonson never responded. Edmonson testified during the trial, that he did not respond to Boyar because he was informed by his attorney that he could no longer speak with Boyar because LCW was represented by counsel.[16] 8/18/09 Trans. 176:4-12.

According to Boyar, LCW offered to make further modifications to the limousine, or to make repairs following de la Espriella's modification on December 4, 2006, but that Edmonson did not make the limousine available for such repairs. In addition, Boyar testified that Edmonson sent him many emails over this period, and that he found "some of them somewhat confusing."[17] 8/20/09 Trans. 39:9-19. Throughout his letters to LCW, Edmonson referred to Boyar as "dad" and LCW as his "family." In addition to expressing his complaints, Edmonson also communicated positive reviews of the limousine to LCW and that the limousine was an "A+++++ vehicle." See Ex. 38. As late as August 16, 2006, Edmonson wrote to Boyar that the problems he had with the limousine were minor, and that "[t]here is no other car out there by any manufacturer that matches this coach."[18] Ex. 113. On January 16, 2007, Edmonson wrote to Boyar and informed him that an "eccentric yet che[a]p" client, that he had "farmed . . . off to several people because he won't step up to my price . . . finally paid my price last night." Ex. 125.

---

[16] Although plaintiff's counsel represented to the Court that the instant action was not filed until May 2007, see 8/20/09 Trans. 83:6-9, the record indicates that the instant action was filed in Los Angeles County Superior Court in March 2007. However, the record is unclear as to whether LCW received notice when the suit was originally filed.

[17] For example, he described a letter from Edmonson dated December 20, 2006, as "rambling." 8/20/09 Trans. 63:17-64:8.

[18] In addition, Edmonson wrote to Boyar that "[m]y car does not squeak, rattle, vibrate, . . . nothing a customer would complain about." Ex. 113.

1    According to Edmonson, although LCW offered to perform further repairs
2 if Edmonson brought the vehicle back to Texas, he testified that he could no
3 longer afford to do so, and that his thought was to "let everything run its course"
4 once he had retained an attorney.  8/20/09 Trans. 98:3-25, 102:17-103:9.
5    On February 6, 2007, Timothy Saurwein ("Saurwein"), plaintiff's expert witness
6 for automotive and limousine operations, repairs and defects, performed a "basic
7 inspection" of the limousine.  Ex. 154.  In his report, Saurwein "verified that the air
8 conditioning or heating system for the rear passenger compartment was not working as
9 designed."[19]  Id.   Saurwein testified that because Edmonson required that the limousine
10 be returned that afternoon, he was unable to complete his inspection on February 6,
11 2007.  8/19/09 Trans. 102:1-5.  In August 2009, Saurwein again inspected the limousine.
12 Id. 109:14.  He testified that he measured a temperature difference of over 30 degrees
13 between the right front air duct and the partition of the limousine.[20]  Id. 110:5-16.
14    According to Edmonson, the problem with the heating system impacted the use of
15 the limousine, especially because he started to turn down or refer business that would
16 involve a cold morning or evening run.  8/18/09 Trans. 126:5-127:25.  He originally
17 testified that he lost "around $40,000" in business, id., but on redirect, Edmonson stated
18 that the actual amount lost during the winter months was $7,800.[21]  8/20/09 Trans.

---

[19] Specifically, he found that the "system will function when set at a very low temp[erature] for air conditioning, or a very high temp[erature] for the heater.  However when setting a desired temp at approx. 72 degrees then the system does not provide for blended air as designed."  Ex. 154.

[20] At trial, defendant's counsel objected on Daubert grounds, 509 U.S. 579 (1993),  to Saurwein giving an expert opinion regarding the performance of the air conditioning system.  8/19/09 Trans. 97:23-98:2.  The Court permitted Saurwein to testify as a percipient witness as to his observations subject to a motion to strike.  Id. 98:3-11.

[21] During cross-examination, Edmonson affirmed that it is customary in his
(continued...)

16:11-21. He further testified that he suffered the following damages: a down-payment of $19,581.18; "approximately thirty-five" monthly lease payments in the amount of $1,943.09 for a total sum of $68,008.65; $3,334.14 on a down-payment for a new lease and eight monthly lease payments in the amount of $1,319.57 for a total sum of $10,556.56;[22] a lease payoff of $35,531.00; and $800 annual registration costs for four years, for total of $3,200.[23] See 8/18/09 Trans 113:5-8, 122:10-15, 123:19-125:7.

### III. CONCLUSIONS OF LAW[24]

The Song-Beverly Act requires that manufacturers of consumer goods sold or leased in California make available to buyers, service and repair facilities at which goods can be repaired to conform to any express warranties provided by the manufacturer.[25]

---

[21](...continued)
industry to receive some sort of payment for referring business and that plaintiff did not produce any documentation regarding "bills of lading" for phone calls received. 8/18/09 Trans. 127:12-128:4.

[22] Edmonson testified that in January 2009, he refinanced the lease on the limousine because he was "starting to get behind on the limo payments." 8/18/09 Trans. 122:18-123:16; see also Ex. 137.

[23] At trial, LCW objected to Edmonson's testimony regarding payments he has incurred on the limousine for lack of supporting evidence. See 8/18/09 Trans. 125:20-24. The Court allowed the testimony subject to a motion to strike.

[24] To the extent necessary, each of these conclusions of law may be deemed to be a finding of fact.

[25] Notably, for purposes of the instant action, the definition of "consumer goods" under the Song-Beverly Act includes products that are "bought" or "leased." Cal. Civ. Code § 1791(a). The Song-Beverly Act explicitly provides that
> The lessee of goods has the same rights under this chapter against a manufacturer and any person making express warranties that the lessee would have had under this chapter if the goods had been purchased by the lessee, and the manufacturer and any person making express warranties
(continued...)

See Cal. Civ. Code § 1793.2(a). In addition, the Act specifies time frames within which repairs under an express warranty must be provided. Service and repair at the manufacturer's authorized repair facility in the state must be commenced "within a reasonable time." Id. § 1793.2(b). Goods must be repaired to comply with the warranty within 30 days, unless delay is caused by conditions beyond the control of the manufacturer or its representative. Id. In those instances when a new motor vehicle cannot be repaired to conform to an express warranty after a "reasonable number of attempts," the Act specifies a remedy — the manufacturer must replace the vehicle or pay restitution.[26] Id. § 1793.2(d)(2). There exists a rebuttable presumption that a "reasonable number of attempts" have been made to repair the vehicle if, within 18 months or 18,000 miles, whichever comes first, either (1) the same problem has been subject to repair four or more times (or, if the problem is likely to cause death or serious bodily injury, two or more times) and the buyer has notified the manufacturer directly of the need for the repair, or (2) the vehicle is out of service for more than 30 calendar days because of repair under the warranty.[27] Id. § 1793.22(b). A buyer damaged by a failure of the manufacturer to comply with any obligation under the Act may bring an action for

---

[25](...continued)
have the same duties and obligations under this chapter with respect to the goods that such manufacturer and other person would have had under this chapter if the goods had been sold to the lessee.
Cal. Civ. Code § 1795.4.

[26] Further, it provides that "the buyer shall be free to elect restitution in lieu of replacement, and in no event shall the buyer be required by the manufacturer to accept a replacement vehicle." Cal. Civ. Code § 1793.2(d)(2).

[27] This presumption shall be a rebuttable presumption affecting the burden of proof, and it may be asserted by the buyer in any civil action, including an action in small claims court, or other formal or informal proceeding. See Cal. Civ. Code § 1793.22(b).

the recovery of damages and other legal and equitable relief.[28]  Id. § 1794(a).

As a threshold issue, LCW contends that the Song-Beverly Act does not apply to this case because the limousine was delivered to and accepted by plaintiff in Texas, not California.[29]  "[F]or the Song-Beverly Act to apply, the subject vehicle must at least have been bought or leased in California."  Park City Services, Inc. v. Ford Motor Co., Inc., 144 Cal. App. 4th 295, 308 (2006).  Although the Court in its order dated July 27, 2009, found that Song-Beverly appeared to apply, so that there was cause to try this action, the additional evidence submitted at trial and recent case law leads to the conclusion that the Song-Beverly Act does not apply to plaintiff's claims.  California law is clear that when title passes outside of California, the Song-Beverly Act does not apply.  See Gaynor v. W. Rec. Vehicles, Inc., 473 F. Supp. 2d 1060, 1062 (C.D. Cal. 2007) (citing Cummins, Inc. v. Superior Ct., 36 Cal.4th 478, 487-90 (2005) (Song-Beverly Act did not apply to motorhome sold in Idaho and subsequently brought into California); Davis v. Newmar Corp., 136 Cal. App. 4th 275, 278 (2006) (Song-Beverly Act did not apply to sale of motorhome negotiated in California where contract required delivery in Arizona); Cal. State Elecs. Ass'n v. Zeos Int'l Ltd., 41 Cal. App. 4th 1270, 1278 (1996) (Song-Beverly Act did not apply to goods where title passed in Minnesota upon shipment of goods from seller to buyer in California)).  California Commercial Code § 2401(2) provides that "[u]nless otherwise explicitly agreed title passes to the buyer at the time and place at

---

[28] If the buyer prevails in an action involving a new motor vehicle, the buyer may recover damages and reasonable attorney fees and costs and, under circumstances involving a willful violation, a "civil penalty of up to two times the amount of damages." Id. § 1794(e)(1).  However, if the buyer fails to serve written notice to the manufacturer requesting compliance with the Song-Beverly "refund or replace" remedies, after occurrence of events giving rise to the presumption in section 1793.22(b), or the manufacturer complies in a timely manner to the notice and request, then the manufacturer shall not be liable for a civil penalty.  See id. § 1794(e)(3)-(4).

[29] LCW submitted a supplemental list of cases in support of its closing arguments regarding the non-applicability of the Song-Beverly Act.

which the seller completes his performance with reference to the physical delivery of the goods." "Thus, when the parties agree to or contemplate shipment by the seller, title passes to the buyer upon that shipment, unless the agreement specifically requires the seller to make delivery at the destination."[30] Zeos Int'l Ltd., 41 Cal. App. 4th at 1277. In the instant case, Advantage purchased the limousine and then leased the vehicle to Edmonson. The bill of sale to Advantage indicates that the "shipping terms" for the limousine were "pickup." Accordingly, under California law, it appears that title passed to Advantage in San Antonio, Texas, where Edmonson took physical possession of the car, as agreed upon by the parties. See Cal. Com. Code § 2401(2). However, the relevant question in the instant case is whether the limousine was nevertheless leased in California, for purposes of the Song-Beverly Act. The Act provides that the lessee has the same rights against the manufacturer that the lessee would have had "if the goods had been purchased by the lessee." Cal. Civ. Code § 1791(a). The Court finds that even though the record indicates that Edmonson signed the final lease document in California, that he signified acceptance of the limousine when he took physical possession of the limousine in Texas, after having inspected the vehicle for two days, signed the "delivery receipt," and making a twenty percent down payment on the limousine. See Cal. Com. Code § 10515 ("Acceptance of goods occurs after the lessee has had a reasonable opportunity to inspect the goods . . . ."); Newmar Corp., 136 Cal. App. 4th at 278. The record does not indicate that Edmonson only conditionally accepted the limousine when he left LCW's headquarters in Texas. Moreover, under California law, if Edmonson had purchased the limousine, title would clearly have passed outside of California. Although Edmonson registered the limousine in California and the lease payments included

---

[30] If the contract explicitly requires delivery, then title passes on tender there. Cal. Com. Code § 2401(2)(b). However, "[i]f the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment." Id. § 2401(2)(a).

16

payment of California taxes, the Court finds that case law does not treat these factors as necessarily dispositive of the issue at hand. See, e.g., Cummins, 36 Cal. 4th at 493 n. 12 (finding that the Act did not apply to vehicles purchased outside of California, and comparing the Act with other state lemon laws which are not limited to vehicles sold in the state and which have alternatively required that the vehicles be licensed or registered in the state); Gusee v. Damon Corp., 470 F. Supp. 2d 1110, 1115 (C.D. Cal. 2007) (finding that protection under the Song-Beverly Act and exemption from California taxes are "not mutually exclusive" because they are governed by entirely different California laws, such that "a consumer good that is sold and shipped from California to another state pursuant to a shipment contract is 'sold in California' for purposes of the Song-Beverly Act, but is exempt from California sales tax"). Therefore, the Court concludes that the Song-Beverly Act does not apply to plaintiff's claims.

However, because it is a close question and there appears to be no case law directly on point, the Court alternatively assumes that the Song-Beverly Act applies and determines whether LCW is liable to plaintiff under the Song-Beverly Act. The Court concludes that even if it could be said that the Song-Beverly Act applies, plaintiff has not demonstrated by a preponderance of the evidence that LCW breached its obligations under the express warranty provision, pursuant to California Civil Code § 1793.2(d). Although Edmonson first complained about a "clicking" sound from the LimoTouch control board, he conceded at trial that this problem has since been satisfactorily repaired at LCW's expense. The Court finds that plaintiff has not established that the subsequent and allegedly persistent problem with the heating system constitutes a nonconformity covered by the warranty that "substantially impaired the use, value, or the safety" of the limousine.[31] See Cal. Civ. Code § 1793.22(e) (provides that "nonconformity" for

---

[31] When Edmonson took the limousine in to Professional Auto Tech, on September 22, 2006, to inspect the heating system, the limousine had been driven approximately 23,963 miles. Thus, it does appear that Edmonson's complaint
(continued...)

purposes of section 1793.2(d), means a nonconformity that substantially impairs the use, value, or safety of the vehicle).  Whether the impairment is substantial is determined by an objective test, based on what a reasonable person would understand to be a defect. Lundy v. Ford Motor Co., 87 Cal. App. 4th 472, 478 (2001).  Plaintiff has failed to demonstrate that the heating problem, namely a lack of heat in the rear compartment when the air conditioning was turned on in the front, was a defect in the material or workmanship of the limousine.  However, even assuming that the heating problem was covered by the express warranty, and that it substantially impaired Edmonson's use of the vehicle, the Court finds that LCW's attempt to fix the problem in December 2006, did not trigger any obligation under the Song-Beverly Act to replace or buy back the vehicle.  See Silvio v. Ford Motor Co., 109 Cal. App. 4th 1205, 1208-09 (2003) (acknowledging that the reasonableness of the number of attempts is generally a question of fact but that a single attempt is in sufficient as a matter of law).  This is especially true, given that the record indicates that LCW was willing to perform further repairs, and potentially even replace the limousine, and that Edmonson did not give LCW another opportunity after December 2006, to cure the heating problem.  Thus, for all these reasons, the Court concludes that plaintiff did not demonstrate that LCW breached its obligations under the Song-Beverly Act.

### IV.   CONCLUSION

Based on the foregoing, the Court concludes that the Song-Beverly Act does not apply to plaintiff's claims.  In the alternative, the Court concludes that even if the Act applies, that LCW did not breach its obligations under the express warranty provision, pursuant to California Civil Code § 1793.2.  Accordingly, the Court awards judgment for defendant LCW.  Each side shall bear its own attorneys' fees and costs.

---

[31](...continued)
with the heating system arose while the limousine was still under warranty.

1      IT IS SO ORDERED

3   Dated: January 26, 2010               _____
                                            CHRISTINA A. SNYDER
                                            UNITED STATES DISTRICT JUDGE